1  Dennis Linthicum

   Oregon State Senator

2  d4linthicum@gmail.com

   36590 Hwy 140 E.

3  Beatty, OR. 97621

4  Tel: 541-892-6513

5  Plaintiff, appearing *Pro Se*

6  Anthony Intiso

7  dbmining@sbcglobal.net

   416 Butte St.

8  Yreka, CA 96097

   Tel: 530-841-0308

9

10 Plaintiff, appearing *Pro Se*

11

              UNITED STATES DISTRICT COURT

12

                 DISTRICT OF OREGON

13

                MEDFORD DIVISION

14

15 DENNIS LINTHICUM AND ANTHONY          Case No. 1: 23-cv-00834-AA

   INTISO,

16

17       Plaintiffs, Appearing Pro Se

18           v.                          COMPLAINT FOR INJUCTIVE

                         RELIEF

19 THE FEDERAL ENERGY REGULATORY

   COMMISSION, THE STATE OF OREGON,

20 THE STATE OF CALIFORNIA and DOES 1

   through 100,

21

22       Defendants.

23

24                      **JURISDICTION**

25      1.    The United States District Court has jurisdiction in this matter since Plaintiff alleges

26 that the actions complained of in the instant case violate federal law, specifically the National Wild

27 and Scenic Rivers Act of 1968, (Public Law 90-542, as amended through P.L. 117-286, December

28 ///

Complaint For Injunctive Relief
Case No.

27, 2022). Those actions are occurring and will continue to take place in both the States of Oregon and California.

## VENUE

2.     The United States District Court for the District of Oregon is the proper venue for this case since Plaintiff, Dennis Linthicum, is a resident of Klamath County, State of Oregon, and because the actions complained of are occurring, in part, in Klamath County, State of Oregon.

## DIVISIONAL VENUE

3.     The Medford Division of The United States District Court for the District of Oregon is the proper Division in which this case should be heard since Plaintiff, Dennis Linthicum, is a resident of Klamath County, State of Oregon, and because the actions complained of are occurring, in part, in Klamath County, State of Oregon, and Klamath County falls within this Court's area of authority.

## PARTIES AND THEIR INTERESTS

4.     Plaintiff, Dennis Linthicum (hereinafter, "Linthicum"), appearing Pro Se, is a resident of Klamath County in the State of Oregon.  He is an Oregon State Senator, water-rights holder and ranch-land owner.

5.     Plaintiff, Anthony Intiso (hereinafter, "Intiso"), appearing Pro Se, is a resident of Siskiyou County in the State of California.  He is a retired individual.

6.     At issue in this case is the removal of four hydroelectric dams along the Klamath River, one (1) of which is located in Oregon while the remaining three (3) are located in California. Removal of the dams will have significant and adverse effects on the Klamath River and its environs.  More importantly, these adverse effects will directly impact the values upon which the Klamath River received the "Wild and Scenic" designation.  The most significant of these values with respect to the Klamath River are its "recreational values.

7.     Both Linthicum and Intiso stand to be harmed by the removal of these dams and, thus, have joined to bring this suit so that each the of the Defendants may be legally named as parties to this suit.

///

Complaint For Injunctive Relief
Case No.

8. Plaintiffs' interests are directly affected by the outcome of this proceeding in several ways, including, but not limited to, loss of water availability both for irrigation and consumption, loss of water quality, loss of property values, loss of livelihood and loss of economic opportunity and economic security. Plaintiffs have also suffered increases in utility costs and are reasonably informed and believe that these costs will increase even further now that the dams have ceased to produce low-cost power for the region.

9. While Plaintiff, Linthicum, currently serves as an Oregon State Senator, he is also a water-rights holder and ranch-land owner whose property lies in Klamath County, Oregon. As a result of the actions which are the subject of this proceeding, Plaintiff, Linthicum and other ranchers and farmers in both Southern Oregon and Northern California have already suffered loss of availability of irrigation water supply and face further reductions if an injunction does not issue.

10. Plaintiff Intiso's water supply is threatened by the proposed actions of Defendants which are the subject of this proceeding. Absent extremely costly and uncertain mitigation efforts, Plaintiff and, indeed, all of the residents of California's northernmost counties, face the possibility of severe tainting, if not total loss, of their water supply if an injunction does not issue.

11. Defendants' actions threaten public health and safety and environmental protection as a result of Climate Change. Climate Change has caused extreme weather fluctuations affecting both water supply and water quality on the Klamath River. By removing the dams, the flood protection function of the dam is also removed, thus threatening downstream communities and riparian habitat in wet years. Removal of the dams also threatens collapse of the water supply and water quality in drought years, not only for relied upon domestic and agricultural use, but also for wildfire suppression, fisheries support, and riparian habitat for wildlife support

12. Defendants' actions also threaten the economic stability and general welfare of the communities in which Plaintiffs reside as these actions will have a direct and negative impact on the recreational uses of the Klamath River which provide a substantial portion of those communities' economic base. Loss of this economic base would have direct negative impacts on Plaintiffs' livelihood, quality of life and economic security. Loss of this economic base could also have far-reaching effects on the overall economic stability of both states as a whole, and while

-3-

both severe and dramatic, the potential effects of this upon Plaintiffs are nonetheless far too expansive and ambiguous to be contemplated by this Court.

13. Defendant, The Federal Energy Regulatory Commission (hereinafter, "FERC") is an independent federal agency that regulates the interstate transmission of electricity, natural gas, and oil. FERC also reviews proposals to build liquefied natural gas (LNG) terminals and interstate natural gas pipelines as well as licensing hydropower projects. The Energy Policy Act of 2005 also gave FERC several additional responsibilities including, amongst other things, responsibility for overseeing environmental matters related to natural gas and hydroelectricity projects. Defendant, The State of Oregon, (hereinafter "Oregon"), is a sovereign state of the United States, and has entered into an agreement with Defendant, California, to jointly authorize and fund the removal of the four hydroelectric dams on the Klamath River which are the subject of this Complaint.

14. Defendant, The State of California, (hereinafter "California"), is a sovereign state of the United States, and has entered into an agreement with Defendant, The State of Oregon, to jointly authorize and fund the removal of the four hydroelectric dams on the Klamath River which are the subject of this Complaint.

15. Plaintiffs are unaware of the true names and capacities (i.e., whether they are individuals, businesses, governmental entities or some other form of legal entity) of Defendants, DOES 1 through 100, inclusive, and therefore sues them by such fictitious names at this time. Plaintiffs will seek leave from this Court to insert their true names and capacities at such time as it becomes necessary, and this information has been determined.

## STATEMENT OF FACTS

16. The Klamath River dams that are the subject of this suit were constructed between 1918 and 1962, and initially fell under the control of the California/Oregon Power Company (COPCO) which was later acquired by and incorporated into the entity now known as PacifiCorp. The dams were owned and operated by PacifiCorp under license from Defendant, FERC.

17. The National Wild and Scenic Rivers System was created by the Wild and Scenic Rivers Act of 1968 (16 U.S.C. 1271-1287), (hereinafter "FWSRA") enacted by the U.S. Congress

1   to preserve certain rivers with outstanding natural, cultural, and recreational values in a free-
2   flowing condition for the enjoyment of present and future generations.

3       18.   Defendant, Oregon, passed The River Democracy Act (hereinafter "RDA") in
4   1968, mirroring the actions of Congress in the FWSRA. The Klamath River was not included in
5   the RDA at that time.

6       19.   In 1972 the portion of the Klamath River stretching from the Oregon/California
7   border to the Pacific Ocean was designated by Defendant, California, as a "Wild and Scenic River"
8   in the California Wild and Scenic River Act (hereinafter, "CWSRA"). Defendant, California,
9   made the determination to include the Klamath River based upon its outstanding recreational
10  values.

11      20.   In 1987 the federal government also designated the Klamath River as a Wild and
12  Scenic River. At this time the Klamath River was added to list of protected rivers included in the
13  FWSRA. The determination to include the Klamath River was based on multiple values and
14  included the entire length of the river beginning at Klamath Lake in Oregon and continuing through
15  to the Pacific Ocean in California. The values upon which the Klamath River was designated
16  "wild and scenic" were accounted as follows: 11.7 miles of the river fall under the "wild" value,
17  this segment being largely untouched and pristine in nature; another 23.5 miles of the river are
18  classified under the "scenic" value, offering unique and extraordinary vistas; while the remaining
19  250.8 miles of the river are so designated for their "recreational" value, offering outstanding
20  opportunities for rafting and boating and access to remarkable fisheries.

21      21.   In 1994 Defendant, Oregon, followed suit, designating that portion of the Klamath
22  River which runs from Klamath Lake to the Oregon/California border as "wild and scenic," and
23  incorporated it under the RDA. The determination to include it was based upon the outstanding
24  and remarkable values of its fisheries, its recreational values and scenic qualities and the
25  appurtenant wildlife.

26      22.   It is important to note that the dams were already in place at the time the river was
27  so designated by both the federal government and Defendants, California and Oregon. Indeed, the
28  dam's placement was critical to the river receiving the "Wild & Scenic" designation. Therefore,

Complaint For Injunctive Relief
Case No.

removal of the dams directly threatens the values upon which the "wild and scenic" designation was dependent and to which both Defendants have committed to protecting.

23.    Historically, the Klamath River did not run on a year-round basis.  Prior to construction of the dams, the river was often known to dry up, almost entirely, during the warmest summer months.  Although seemingly a contradiction in terms, placement of the dams and regulation of water flow in fact created the appropriate flow-rates to attain the year-round "free-flowing" description central to the "wild and scenic" recreational value assigned to the Klamath River.

24.    The reservoirs created behind the dams also served their original intent and purpose as embodied in the very word, "reservoir," and have held vital water supply during the many extended years of drought suffered by the Northern California communities, enabling their survival as well as maintaining the water flow in the Klamath River.

25.    Having determined that it would be in its best financial interests to do so, PacifiCorp has been exploring options for the past two decades for decommissioning and removing the dams.

26.    However, the prospect of removing the dams has been the subject of much controversy in the region.  For this reason, during the 2007 General Election, voters in several areas of the region were given the opportunity to weigh in on the matter through advisory referenda intended to guide the actions of their local county governments.

27.    A majority of the voters across the region voted to retain the dams.  Of those voters in Klamath and Siskiyou Counties who responded to the question, 69% in Klamath County and 79% in Siskiyou County chose to retain the Klamath River dams and voted against dam removal. Notably, while local tribal governments *officially* support removal of the dams, the largest portion of *individual members* of the tribes do not.

28.    Nonetheless, in February 2010, various disparate groups, including PacifiCorp, multiple government agencies, several tribes and multiple NGOs from the states of Oregon and California, joined in a set of agreements to address removal of the four Klamath River dams.

29.    To take effect, however, these agreements were contingent upon passage of certain federal legislation.  The required legislation would have included, in part, funding for the project

-6-

Complaint For Injunctive Relief
Case No.

1  and protections for PacifiCorp, shielding it from liabilities and cost overruns that might be

2  associated with dam removal. No such legislation, however, was ever passed.

3      30.    In a situation bearing striking similarities to that which is the subject of the instant

4  action, two (2) hydroelectric dams were removed from the Elwha River in Washington State. The

5  process began in 2011 and was completed in 2012. At the time it was the largest dam removal

6  effort in U.S. history. The title of largest dam removal project now applies to the Klamath River

7  dam removal project. Just as with the Klamath River dam removal project, one of the prime

8  anticipated benefits of removal of the dams on the Elwha River was the restoration and

9  reinvigoration of historic fisheries of the Coho Salmon and Steelhead Trout.

10     31.    During this time and preparatory to giving the project serious consideration, FERC

11  commissioned an Environmental Impact Statement (hereinafter, EIS) to be prepared. The "draft

12  version" of that EIS was submitted for public review and comment in 2013.

13     32.    Attached hereto as Exhibit 1, is a photograph taken from the National Park

14  Service's website. This photo contrasts the mouth of the Elwha River in 2011 prior to removal of

15  the two dams with the mouth of the Elwha River as it existed in 2014, two years after completion

16  of the dam removal project. Using what the authors call "conservative" estimates, the EIS states

17  that the impact of sediments released in removal of the dams would have a significant impact but

18  that this impact would be only "short-term," meaning that the impact is not estimated to last longer

19  than two years.

20     33.    However, in a project that involved removal of only *two* dams, as opposed to the

21  *four* dams involved in the Klamath River project, it is clear that two years was far from sufficient

22  for the impacts to have been mitigated. Moreover, as no efforts were made to mitigate this impact,

23  the result has been the formation of what is, for all intents and purposes, a new river delta.

24  Plaintiffs are more than happy to acknowledge that this new delta provides a wealth of habitat and

25  protections for any number of species that were not historically based in the mouth of the river.

26  However, this habitat and the species it supports are *not* part of the river's historical makeup and

27  therefore no claim to "restoration" of the river should be considered accurate.

28  ///

-7-

34.     When it became apparent that the desired federal legislation would not be forthcoming for the Klamath River Dam Removal Project, those agreements were set aside and the parties returned to the table for a new set of discussions in 2015.

35.     In 2016, these discussions gave rise to a new agreement between PacifiCorp, Defendants, Oregon and California, the U.S. Department of the Interior, the National Marine Fisheries Service and the Yurok and Karuk Tribes. As with the prior agreements, the intent of this new agreement was to facilitate the dam removal project.

36.     Under this new agreement, PacifiCorp would transfer the four dams to the nonprofit organization, Klamath River Renewal Corporation (hereinafter, KRRC), as a successor licensee and the designated dam removal entity.

37.     Following public comments and input from a wide variety of interested parties, a "final version" of the EIS was compiled, and this final version was made available to the public in early 2020. The final version of the EIS consisted of the original "draft" version with an addendum containing the public comments and details of any changes to the draft."

38.     On July 16, 2020, FERC entered an order approving a partial transfer of the license for the Klamath River Dams from PacifiCorp as the sole owner, to PacifiCorp and KRRC as joint licensees.

39.     FERC explained it's rationale for this decision as follows:

"[t]ransferring a project to a newly formed entity for the sole purpose of decommissioning and dam removal raises unique public interest concerns, specifically whether the transferee will have the legal, technical, and financial capacity to safely remove project facilities and adequately restore project lands". (7/16/20 Order at 67.)

40.     FERC went so far in its decision as to state explicitly that, "PacifiCorp will not be shielded from liability for dam removal". (7/16/20 Order at 68.)

41.     During its deliberations, FERC reached the conclusion that it had sufficient authority under federal law to require PacifiCorp to remove the dams at PacifiCorp's own expense, but it did not choose to do so. This is fortunate, however, since it is questionable whether FERC has such authority since, as will be asserted later in this Complaint, such a determination would be

///

-8-

Complaint For Injunctive Relief
Case No.

1   contrary to the unambiguous legislative mandate established by the Federal Wild and Scenic

2   Rivers Act.

3          42.    Following FERC's order in July, 2020, on or about November 16, 2020, PacifiCorp,

4   KRRC, Defendants, Oregon and California, and certain Native American tribes entered into a

5   Memorandum of Agreement (hereinafter, "The MOA"), a true copy of which is attached hereto as

6   Exhibit 2.

7          43.    Per The MOA, PacifiCorp and Defendants, Oregon and California, will each share

8   one-third responsibility for any cost overruns associated with the dam removal project.

9          44.    The MOA also included, among other things, the following language:

10             KRRC will serve as the Dam Removal Entity, which includes providing the
               identified insurance, bonding, contracting, and indemnity provisions to the States
11             and PacifiCorp. KRRC and the States, as co-licensees, will carry out the final
               license surrender order to effectuate Facilities Removal. Once ownership of the
12             Facilities is transferred for purposes of Facilities Removal, the States will defend
               PacifiCorp to the fullest extent of the law possible, including seeking to dismiss or
13             remove PacifiCorp from any litigation asserting damages arising from harm caused
14             by Facilities Removal.

15         45.    Satisfied with this language and despite the reservations it had previously

16  expressed, on or about November 17, 2022, FERC approved transfer of the licenses to KRRC and

17  approved KRRC as the dam removal entity.

18         46.    In October, 2022, more than 10 years after removal of the Elwha dams, Dr. Anne

19  Shaffer, PhD, of both the Coastal Watershed Institute and the non-profit group Rewilding Earth

20  made this report from the mouth of the Elwha River:

21             "The juvenile herring and sand lance born just last spring are shoaling in spectacular
               numbers along the nearshore as they ready to move offshore for the winter. It's a
22             remarkably abundant landscape and the fall visibility is, for once this year, clearer
               under water than above due to wildfire haze. Troubling observation is that these
23             images should also include adult coho, steelhead, cutthroat (and others)—but they
24             are not here. *The ominous low flows from the unrelenting high pressure system are
               likely at play.*"[1] (emphasis added)

25  ///

26  ///

27  
    _____
28  [1]   Dr. Anne Shaffer, PhD, of the Coastal Wetlands Institute, October, 2022
          Reported at:  https://rewilding.org/elwha-nearshore-autumn-2022-update/

                                              -9-

    Complaint For Injunctive Relief
    Case No.

1

## PAINTIFFS' FIRST CLAIM

2

### FOR VIOLATION OF THE WILD AND SCENIC RIVERS ACT

3          47.    Plaintiffs repeat, replead and reallege paragraphs 1 through 46, inclusive, of this

4    complaint and incorporate same by reference as if repeated here in full at this point.

5          48.    Section 7 (a) of the WSRA reads as follows:

6              *The Federal Power Commission shall not license the construction of any dam,*
               *water conduit, reservoir, powerhouse, transmission line, or other project works*
7              *under the Federal Power Act (41 Stat. 1063), as amended (16 U.S.C. 791a et seq.),*
               *on or directly affecting any river which is designated in section 3 of this Act as a*
8              *component of the national wild and scenic rivers system or which is hereafter*
               *designated for inclusion in that system, and no department or agency of the United*
9              *States shall assist by loan, grant, license, or otherwise in the construction of any*
10             *water resources project that would have a direct and adverse effect on the values*
               *for which such river was established,* as determined by the Secretary charged with
11             its administration. (Emphasis added)

12

13         49.    As stated in Paragraph 37, above, the final EIS for this project commissioned by

14   Defendant, FERC, was released in early 2020. Section 3 of the EIS details the envisioned impacts

15   of the proposed project and what, if any, mitigation efforts the authors of the report took into

16   consideration. Several of those impacts are described as significant, having both short- and long-

17   term effects. The FWRSA makes no distinction, however, between short- or long-term, temporary

18   or permanent, adverse effects. Indeed, the FWSRA does not even take the significance of an effect

19   into account nor does it consider the severity of the effect. Legislative will and intent is clear: No

20   project shall proceed if that project will have an adverse effect on the values for which a river

21   received its "wild and scenic" designation, and an agency has no discretion in this interpretation.

22         50.    In National Assn. of Home Builders v. Defenders of Wildlife, 551 U.S. 644 (2007),

23   Defendants had originally petitioned the lower courts to block transfer of licensing authority from

24   the EPA to state agencies citing the Clean Water Act and the Endangered Species Act and claiming

25   that the EPA should have taken other considerations into account and denied the transfer

26   application. The lower courts concurred and ruled that the EPA was in violation of the Law in the

27   transfer of licensing authority. Upon review, the High Court reversed the lower courts' decisions,

28   ruling that the language of the Clean Water act constituted a legislative mandate, and that the EPA,

Complaint For Injunctive Relief
Case No.

1  therefore, had no discretion to act otherwise.  Writing for the majority, Justice Alito's Opinion

2  states:

> Section 402(b) of the CWA provides, without qualification, that the EPA "shall
> approve" a transfer application unless it determines that the State lacks adequate
> authority to perform the nine functions specified in the section. 33 U. S. C.
> §1342(b). By its terms, the statutory language is mandatory and the list exclusive;
> if the nine specified criteria are satisfied, the EPA does not have the discretion to
> deny a transfer application. Cf. Lopez v. Davis, 531 U. S. 230, 241 (2001) (noting
> Congress' "use of a mandatory 'shall' . . . to impose discretionless obligations");
> Lexe- con Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U. S. 26, 35
> (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to
> judicial discretion"); Association of Civil Technicians v. FLRA, 22 F. 3d 1150,
> 1153 (CADC 1994) ("The word 'shall' generally indicates a command that admits
> of no discretion on the part of the person instructed to carry out the directive");
> Black's Law Dictionary 1375 (6th ed. 1990) ("As used in statutes . . . this word is
> generally imperative or mandatory").
> *National Assn. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) at
> 14

51.    The FWSRA clearly states that no "project that would have a direct and adverse

effect on the values for which such river was established" shall be licensed, this is clearly

mandatory and imperative language per the standard set in Homebuilders.

52.    In Homebuilders, quoting the standard originally established in Chevron, The High

Court made clear that where statutory language is clear, "The Court as well as the agency must

give effect to the unambiguously expressed will of congress":

> We have recognized that "[t]he latitude the ESA gives the Secretary in enforcing
> the statute, together with the degree of regulatory expertise necessary to its
> enforcement, establishes that we owe some degree of deference to the Secretary's
> reasonable interpretation" of the statutory scheme. *Babbitt v. Sweet Home Chapter,
> Communities for Great Ore.*, 515 U. S. 687, 703 (1995). But such deference is
> appropriate only where "Congress has not directly addressed the precise question
> at issue ... through the statutory text." *Chevron U. S. A. Inc. v. Natural Resources
> Defense Council, Inc.*, 467 U. S. 837, 843 (1984).

>> "If the intent of Congress is clear, that is the end of the matter; for the court,
>> as well as the agency, must give effect to the unambiguously expressed
>> intent of Congress.... [However,] if the statute is silent or ambiguous with
>> respect to the specific issue, the question for the court is whether the
>> agency's answer is based on a permissible construction of the statute." Id.,
>> at 842-843 (footnotes omitted).
> *National Assn. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) at
> 18

53.     Section 3.2.5.2 of the EIS specifically addresses impacts related to Suspended Sediment Concentration (SSC) and addresses the impact from the release of several hundred thousand cubic tons of sediment currently trapped behind the dams. The EIS concludes that the impact will be "significant and unavoidable" in the short term (meaning up to two (2) years post dam removal) but suggests there will be no significant long-term impact.·

54.     Plaintiffs disagree, in fact, with the conclusion that there will be no long-term impacts and, more importantly, question whether even the proposed long-term benefits of the dam removal project will ever be realized.  This is, however, irrelevant under the FWSRA which mandates that no project shall be approved if that project is known to or can be shown to have an adverse effect on the values for which a wild and scenic river was so designated.  Such adverse effects immediately disqualify any proposal from consideration or licensure and this without regard for significance or duration.

55.     Nonetheless, attached hereto as Exhibit 1, and in support of the explanation provided above of the EIS authors' conservative estimates, is a photo taken from the website of the National Park Service after the removal of the Elwha dams in Washington state.  This photo compares the mouth of the Elwha River in 2011 just prior to dam removal with the same area in 2014. The impacts upon the "scenic" and "recreational" values of the Elwha River are obvious – a waterway once filled with clean and pristine water is now brown and filled with detritus and debris. The mouth of the Elwha, once unobstructed and free flowing, is now a clogged river delta with a large chain of sandbars effectively blocking access to the river.

56.     Also attached as Exhibits 3 and 4, respectively are photos taken from the websites of Joel Rogers Photography and Oregon Public Broadcasting, both of which purport to show the return of native vegetation to the former Elwha riverbed.  While the surrounding vegetation is certainly lush, the actual riverbed, however, shows little more than wide swaths of infertile sediment deposits and a river with largely sluggish and anemic flows that would now be more properly described as a stream rather than a river.

57.     Since any reasonable man would conclude that results similar to the Elwha can be expected on the Klamath, the impacts upon the Klamath's "wild and scenic" recreational and

1  scenic values are clear, which issue is made even more dramatic when one considers that over a

2  decade has passed since the Elwha River dams were removed.

3      58.    Since the Klamath River was designated as a Wild and Scenic River based in largest

4  part due to its outstanding recreational values, but to a lesser degree also upon the pristine and

5  untouched nature of certain segments; and since the sediment deposits that will be left behind will

6  have significant adverse effects both on the scenic and recreational values of the river, and since

7  the language of the FWSRA mandates that no project shall be licensed that would have any such

8  effects upon those values, and since the EIS makes clear that this project will do exactly that,

9  FERC should, therefore, have denied the application for dam removal.

10                        ·PAINTIFFS' SECOND CLAIM

11              FOR VIOLATION OF THE WILD AND SCENIC RIVERS ACT

12      59.    Plaintiffs repeat, replead and reallege paragraphs 1 through 58, inclusive, of this

13  complaint and incorporate same by reference as if repeated here in full at this point.

14      60.    Upon reasonable information and belief, Plaintiffs allege that significant portions

15  of the Klamath River are now closed to recreational opportunities, including, but not limited to

16  camping, rafting, swimming and fishing.  This is a direct and meaningful adverse effect resulting

17  from only the preparatory stages of the dam removal project and further and greater harms to those

18  recreational values can only result if an injunction does not issue.

19      61.    While the FWSRA does not make provision for either the significance or duration

20  of adverse effects upon the values for which an included river was so designated, as with the

21  sediment deposits which are the subject of The First Claim for Violation of this Complaint, above,

22  it is important to note that any proposed mitigation of this impact must once again be highly suspect

23  in light of the current state of the Elwha.River in Washington State.   Despite numerous,

24  "scientific," reports touting the marvelous recovery of the river, the photographic evidence offered

25  in those very reports often contradicts the claims being made, two examples of which are attached

26  hereto as Exhibits 3 and 4 of the First Claim for Violation of this Complaint, above.

27      62.    Since the Klamath River was designated as "Wild and Scenic" based in largest part

28  on its outstanding recreational values, both active uses of the river, as in rafting, and passive uses

                                      -13-

1    of the river, as in camping, and since these uses are all appurtenant to the Klamath River's

2    outstanding fisheries, and since those recreational values are dependent, in part if not entirely, on

3    the proper water flow, volume and velocity that has been created by the presence of the

4    hydroelectric dams on the Klamath River and since the dam removal project has already severely

5    impacted, removed, restricted and curtailed any opportunities for the enjoyment of those values,

6    and since the FWSRA explicitly prohibits any activities that would adversely affect those values

7    and the subject impact, removal, restriction and curtailment clearly falls under that description,

8    any and all such activities and indeed the project itself, are contrary to law.

9                    **FIRST REQUEST FOR RELIEF – DECLARATORY RELIEF**

10        63.   Plaintiffs request relief from this Court in the form of a declaration, declaring that

11   Defendant, FERC's, approval and licensing of any project for removal of dams along the Klamath

12   River is contrary to the expressed will of Congress as expressed in the Federal Wild and Scenic

13   Rivers Act, and therefore contrary to Law.

14            **SECOND REQUEST FOR RELIEF – AN ORDER TO REVERSE OR REMAND**

15        64.   Plaintiffs request relief from this Court in the form of an order reversing Defendant,

16   "FERC's" decision to approve and license the dam removal project which is the subject of this

17   suit.  Alternatively, Plaintiff requests that this Court remand the question to FERC for further

18   review.

19                    **THIRD REQUEST FOR RELIEF – A COURT ORDER**

20        65.   Plaintiff requests relief from this Court in the form of an Order, directing

21   Defendants, California and Oregon, as well as their agents, assigns and contractors to restore any

22   and all damages to existing infrastructure, including but not limited to, the dams themselves,

23   equipment related to generation of hydroelectric power, fisheries and any habitat which has been

24   significantly disturbed.

25                    **FOURTH REQUEST FOR RELIEF – INJUNCTIVE RELIEF**

26        66.   Other than as may be necessary to fulfill the terms of the Relief sought in Plaintiffs'

27   Third Request for Relief, Plaintiffs request relief from this court in the form of an injunction

28   permanently enjoining Defendants, California and Oregon, including their agents, assigns,

-14-

Complaint For Injunctive Relief
Case No.

1  successors or contractors, from any and all current or future physical activities related to removal

2  of any of the dams currently in place on the Klamath River.  This would include, but is not limited

3  to, administrative, mechanical, exploratory, preparatory or research operations, related to the dam

4  removal project

5          **FIFTH REQUEST FOR RELIEF – INJUNCTIVE RELIEF**

6          67.    Other than as may be necessary to fulfill the terms of the Relief sought in Plaintiffs'

7  Third Request for Relief, Plaintiffs request relief from this court in the form of an injunction

8  permanently enjoining Defendants, California and Oregon, including their agents, assigns,

9  successors or contractors, from any and all current or future financial activities related to the dam

10  removal project, including but not limited to funding, authorization of funding or any expenditure

11  of funds beyond those reasonably associated with the "shut-down" of a major project

12          **SIXTH REQUEST FOR RELIEF – EQUITABLE RELIEF**

13          68.    Plaintiffs' Sixth Request for Relief from this Court is an Order directing Defendants

14  to pay Plaintiffs' costs of suit incurred herein along with any other financial relief due Plaintiffs'

15  that this Court may deem just and equitable.

16

17  *By affixing our names and signatures below:*  We hereby swear and attest, under penalty of perjury

18  under the laws of this Court, that the foregoing is true and correct to the best of our knowledge.

19

20

21  06/08/2023

22  _____
            *Date*

            *Dennis Linthicum, Oregon State Senator*
            Plaintiff, appearing Pro Se

23

24

25  06/08/2023

26  _____
            *Date*

            *Anthony Intiso*
            Plaintiff, appearing Pro Se

27

28

Complaint For Injunctive Relief
Case No.

-15-